## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **PATRICE HAIRSTON,** | **CRIMINAL ACTION NO.** |
| **BOP Reg. # 64704-019,** | **1:13-CR-199-ODE-JCF-1** |
| **Movant,** | |
| | **CIVIL ACTION NO.** |
| **v.** | **1:16-CV-3710-ODE-JCF** |
| | |
| **UNITED STATES,** | **MOTION TO VACATE** |
| **Respondent.** | **28 U.S.C. § 2255** |

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Movant, Patrice Hairston, has filed a 28 U.S.C. § 2255 motion to vacate her

sentence. (Doc. 193). **IT IS RECOMMENDED** that the motion be **DENIED**.

## I.    Background

On May 14, 2013, a federal grand jury sitting in the Northern District
of Georgia indicted Patrice Hairston [Movant], Sarah Hyldahl, Bonnie
Rose, and Ronnika Allen, for conspiracy, mail fraud, and wire fraud
arising from a residential mortgage fraud scheme. Specifically,
[Movant] was charged with conspiracy under 18 U.S.C. § 1349 (Count
1), mail fraud under 18 U.S.C. § 1341 (Counts 2 and 3), and wire fraud
under 18 U.S.C. § 1343 (Counts 4, 5, 6, and 8). Hyldahl, Rose, and
Allen subsequently pled guilty pursuant to written plea agreements that
included cooperation provisions.

(Gov't Resp. (Doc. 205) at 2 (formatting altered; citations omitted)).

The government summarizes the evidence from Movant's trial as follows:

Between August 2008 and January 2009, [Movant] and her cooperating
co-defendants obtained . . . loans on six properties from Quicken

Loans, Inc. ("Quicken"). Two loans were for co-defendants Rose and Allen to purchase properties for themselves, and four loans were for straw buyers to purchase town homes in the Ewell Parc subdivision, one of which [Movant] herself moved into and occupied. [Movant], a real estate agent, was involved in and helped carry out each aspect of the fraud scheme to obtain these loans charged in the indictment.

[Movant] and her co-defendants obtained each of these loans by means of false representations about the borrowers' employment, income, and bank account balance. [Movant] falsely represented and verified for Quicken that the straw borrowers were employees of two companies that she co-owned with Rose, Executive Offices Plus and Marketing Communications Group. Using her laptop computer, [Movant] made false W-2s and earnings statements (also referred to as paystubs) that were submitted to Quicken to support false employment and income representations on loan applications. . . . [E]mails between [Movant] and Allen documented that [Movant] manufactured fake documents to help borrowers qualify for loans.

[F]or the straw borrower/Ewell Parc loans, [Movant] and her co-defendants obtained and attempted to obtain "marketing fees" between $50,000 and $70,000 that were paid or would be paid from the loan proceeds at closing, although no legitimate marketing work had been done. [Movant] helped falsify documentation that was provided to the closing attorney to obtain a "marketing fee" out of Quicken's loan proceeds. [Movant] and her co-defendants used these funds to pay kickbacks to the borrowers, to fund down payments that the straw borrowers were supposed to make from their own funds (which they did not have), and to enrich themselves. [Movant] shared in and split the remaining proceeds from the fraudulently obtained "marketing fees" equally with her co-defendants. [Movant] ended up living in one of the Ewell Parc properties, which was purchased in the name of one of the straw borrowers. [She] did not make payments on the mortgage.

(*Id.* at 4-6 (citations and footnote omitted); *see id.* at 5 n.3 ("For each loan, the

Government introduced exhibits numbered to correspond to the substantive mail and

2

wire fraud counts in the indictment. These exhibits included documents from the lender's file, numbered to correspond to the count and marked as the "A" exhibit, and from the closing attorney's file, marked as the "B" exhibit. Additional documents, such as bank records, emails, and wire receipts, relating to these loans were marked as C, D, E, and so on."))

Movant "and her co-conspirators pocketed most of the 'marketing fees' as their share of the fraud proceeds. The testimony at trial was that [Movant] and her co-conspirators all shared in the proceeds. Bank records corroborated this. For example, [Movant] received $18,000 cash from the Bostic loan for 2259 Ewell Park." (Doc. 130 (Gov't Sentencing Mem.) at 5). "As a real estate agent, [Movant] shepherded some of the fraudulent transactions through to closing, earning a real estate commission of $7,000 to $9,000 each on three loans for such work." (*Id.*). "In addition to an almost $70,000 'marketing fee,' [Movant] earned a real estate commission of over $7,000 for closing th[e] fraudulent" "Ayana Chambers/2273 Ewell Park loan." (*Id.* at 5-6). Movant "was arrested on January 22, 2009, bringing straw buyer Heather Moomey's cash from [a] borrower check to a closing from which Defendant and her co-conspirators intended to get over $75,000 in fraud proceeds. As with the other loans, [Movant] had made the false W-2s and paycheck stubs (or earnings statements) used to qualify Moomey for the loan." (*Id.* at 6).

3

> As the chart at Exhibit A shows, [Movant] and her co-conspirators executed their fraudulent scheme multiple times, for multiple loans and monies, for over a year. [Movant] engaged in very straightforward, unambiguous fraud: lying and creating false documents to get money from others. Unlike some cases, there are no grey areas, no issues of good faith, and no issues of mistake on [Movant's] part in this case. But for the law enforcement sting at the Moomey closing, there is no indication that the scheme would have stopped.

(Id. at 17).

## II.   The § 2255 Motion

In her § 2255 motion, Movant claims ineffective assistance of counsel with respect to every phase of her trial and appeal. (See Docs. 193, 200, 202-03, 212).

## III.   Standard of Review

A federal prisoner may file a motion to vacate her sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). But it is well-settled that "to obtain collateral relief, a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982).

## IV.   Movant's Grounds For Relief: Ineffective Assistance Of Counsel

Movant, referring to herself as petitioner throughout her pleadings, offers four

4

grounds for relief, alleging ineffective assistance of trial counsel in the first three grounds and ineffective assistance of appellate counsel in the fourth.

The Supreme Court set forth the standard for evaluating claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984); *see Dell v. United States*, 710 F.3d 1267, 1272 (11th Cir. 2013) (applying *Strickland* standard of review to ineffective-assistance-of-counsel claim raised in § 2255 motion). "An ineffectiveness claim . . . is an attack on the fundamental fairness of the proceeding whose result is challenged." *Strickland*, 466 U.S. at 697. The analysis involves two components, but a court need not address both if the petitioner "makes an insufficient showing on one." *Id.*

First, a federal court determines "whether, in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. The court "must be highly deferential" in scrutinizing counsel's performance and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In other words, the petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (Internal quotations omitted). "Given the strong presumption in favor of competence, the petitioner's burden of persuasion — though

the presumption is not insurmountable — is a heavy one." *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (*en banc*). Second, a federal court determines whether counsel's challenged acts or omissions prejudiced the petitioner, i.e., whether "there is a reasonable probability" — one "sufficient to undermine confidence in the outcome" — that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

> To prevail on a claim of ineffective assistance, a defendant must establish two things: (1) "counsel's performance was deficient," meaning it "fell below an objective standard of reasonableness," and (2) "the deficient performance prejudiced the defense." *Strickland*[], 466 U.S. [at] 687-88 []. To satisfy the deficient-performance prong, the defendant must show that counsel made errors so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment. *Id.* at 687. The defendant must rebut the strong presumption that his counsel's conduct fell within the range of reasonable professional assistance. *Id.* at 689.

*Connolly v. United States*, 568 Fed. Appx. 770, 770-71 (11th Cir. 2014).

The foregoing analysis also applies to claims of ineffective assistance of appellate counsel. "A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney." *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). "A defendant can establish ineffective assistance of appellate counsel by showing: (1) appellate counsel's performance was deficient, and (2) but for counsel's deficient performance he would

6

have prevailed on appeal." *Shere v. Sec'y, Fla. Dep't of Corr.*, 537 F.3d 1304, 1310 (11th Cir. 2008) (citing *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000)). But appellate counsel "need not advance every argument, regardless of merit, urged by the appellant." *Lucey*, 469 U.S. at 394; *see Robbins*, 528 U.S. at 288 (noting that "it is difficult to demonstrate that [appellate] counsel was incompetent" for failing "to raise a particular claim," and "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome" (internal quotations omitted)).

### A.    Ground One: Ineffective Assistance At The Pretrial Stage

#### 1.    Movant's Claims And Arguments

In ground one, Movant claims ineffective assistance of counsel during the pretrial proceedings:

l.    Counsel . . . failed to review the discovery . . . with [her].

2.    Counsel . . . failed to investigate the purported "victims"[;] counsel would have found that all of the alleged victims had not reported ANY loss and would further have discovered that the alleged losses were not within the temporal scope of the conspiracy as defined by the indictment of December 1, 2007 through February 11, 2009.

3.    Counsel . . . never asked [Movant] about the events pertaining to or surrounding the instant case.

4.    Counsel . . . never obtained police report to validate original arrest and events from January 22, 2009, or [sought] surveillance camera footage

7

between the times of approximately 12:30 p.m. and 5:42 p.m. as [Movant] request[ed], which would have corroborated the true testimony that [she] made at the Suppression Hearing [and would have prevented her from receiving] the "Obstruction of Justice" enhancement of 2 points.

5.    Counsel . . . failed to notice or present Speedy Trial violations.

6.    Counsel . . . failed to use the compulsory power of the court on [Movant's] behalf[, whereas t]he Government subpoenaed numerous witnesses . . . . [Counsel failed to]:

   (a)    subpoena[] witnesses;
   (b)    interview anyone;
   (c)    consult or engage a forensic accountant, preferably one with knowledge or area of expertise in mortgages/finance;
   (d)    subpoena or interview any of the interns, administrative staff, contractors, etc. who did work for the companies owned and/or operated by defendants;
   (e)    subpoena or interview any of the clients (current and previous) that contracted with the companies owned and/or operated by defendants;
   (f)    consult or engage a handwriting analyst, who would have been in a position to dispute or confirm the likelihood of signatures; instead he chose to concede to [Movant's] guilt against her wishes.

7.    Counsel . . . violated her Fifth Amendment right to Due Process and to effective counsel when he failed to research and investigate any of the charges alleged by the government thereby missing the fact that Quicken Loans, Inc. did not qualify as a financial institution at the time; so therefore [there] was not a federal offense during the period of the alleged conduct.

8.    [Movant] incorporate[s] ¶¶ 1-7, [showing that] but for counsel's unprofessional errors coupled with the fact that he did not raise [] other options, jurists of reason would agree that the outcome of the

8

sentencing would have been different and defendant would have received the benefit of that difference ranging from a dismissal to the charge of misprision of felony only and the loss amounts along with restitution being corrected accordingly.

(Doc. 200 at 13-14). Movant argues:

> [Trial counsel R. Gary Spencer] failed to make even the most minimal investigation into the facts told him; failed to interview anyone or even get public documents or information which would have supported the truth [Movant] told him. There were documents that had been given to him on no less than three [] occasions, which either he did not review and/or did not get an understanding of until the evening before the sentencing hearing. While having this discussion regarding the lack of loss and why, he made the statement, "If I can't understand it, then she (meaning the judge) is not going to be able to understand it." His lack of comprehension or understanding of the alleged losses that were not within the temporal scope of the conspiracy as defined by the indictment of December 1, 2007 through February 11, 2009, was further reiterated in the sentencing hearing when he stated, "It was my fault. I did not understand the nature of what my client was trying to explain to me, quite frankly." That statement in and of itself admittedly shows that counsel was at best incapable of effectively representing [Movant] and . . . presenting a case in her defense.

(*Id.* at 7-8). Movant contends that the government failed to charge or prove an essential element of the allegedly fraudulent scheme, namely, the intent to defraud:

> When examining the indictment there appears a fundamental error on the face of the record. The fundamental error being that the government failed to charge in the indictment that the defendant(s) INTENDED to defraud the alleged victim, Quicken Loans. Within the temporal scope of the conspiracy as defined by the indictment, Quicken Loans, Inc. got exactly what it bargained for: to charge fees and exchange less valuable property for more valuable property. Thus the defendant(s)' alleged scheme neither harmed nor contemplated any harm to Quicken Loans.

9

(*Id.* at 9; *see id.* at 11 ("The defendant never intended to harm the victim, Quicken Loans, Inc., nor was any harm remotely foreseeable. In order to establish intent to harm there must exist a discrepancy between the benefit reasonably anticipated because [of] the misleading representations and the actual benefit the defendant delivered, or intended to deliver, to the victim. In the instant case, there was no such discrepancy; the defendants in no way misrepresented to Quicken Loans the nature or quality of the property they were purchasing. Quicken Loans received exactly what they bargained for: the title to properties with values in excess of the loan amount at agreed upon prices."); *see id.* ("Quicken sold all the properties for a substantial gain within weeks of purchasing the properties.")). Movant also argues that none of the alleged victims, including Quicken, was a financial institution "within the temporal scope of the conspiracy," and therefore "these 8 mortgages and allegations must be dismissed and removed from any punitive imposition against the petitioner as they were not a federal offense during the period of the alleged conduct." (*Id.* at 12-13).

### 2.   The Government's Response

The government responds to Movant's argument as follows:

[Movant's] fraud inflicted actual losses on the entities that purchased the fraudulent loans from Quicken. Such entities suffered actual losses

when they sold the property to third parties for less than the outstanding loan amount. The Eleventh Circuit has specifically approved this method of determining Guideline losses in a mortgage fraud case. United States v. Cavallo, 790 F.3d 1202, 1233 (11th Cir. 2015) (affirming loss determinations where PSR [Presentence Investigation Report] subtracted the post-foreclosure sales price from the outstanding loan balance for properties that had been sold). [Movant's] argument otherwise is a counter-factual, repackaged, and unsupported version of the argument that counsel made at sentencing (although [Movant] now claims it extends to all loans, not just two). Whether Quicken sold the loans for a substantial gain within weeks of making the loans, or whether "bid-in" foreclosure prices were the same as outstanding loan amounts as argued at sentencing, [is irrelevant because] *the entities that owned the fraudulent loans suffered actual losses after foreclosing and selling the property for a lesser amount to a third party*.

Although she faults defense counsel for failing to "make even the most minimal investigation" into this issue, [Movant] does not explain what counsel allegedly should have discovered or from who or what he should have discovered it. If [Movant] means that counsel failed to investigate the "bid-in" price loss argument that he raised at sentencing, that argument is lacking because lenders incurred a loss when they sold the properties to third parties at an amount less than the outstanding loan amount. [Movant] points to counsel's admission at sentencing that he was tardy in raising the "bid-in" price argument, but that cannot have affected the result because that argument would not have reduced [Movant's] Guideline loss even if it had been timely raised. Nor would it have provided a defense at trial . . . .

[Movant] also argues that there were no actual losses and that she did not have any "intent to harm" based on the security interest that Quicken obtained in properties securing each loan. With respect to any loss issue under the Guidelines, the value of properties when the loan was made is irrelevant for Guidelines purposes. The Guidelines specifically provide that collateral property in a mortgage fraud case is to be valued not when the loan is made, but later when the collateral is sold as in this case. U.S.S.G. § 2B1.1, app. note 3(E)(ii), (iii); Cavallo,

790 F.3d at 1235.

> [Movant's] claim that she lacked "intent to harm" because the lender got a security interest in exchange for a loan does not present a valid defense that could have affected the outcome of this case. [Movant] wholly ignores that she exposed Quicken to a risk of loss, or harm as she puts it, by lying to Quicken about its borrower's financial qualifications. Quicken [did] not just [lend] money for a collateral interest in property – [it did so] in exchange for a financially qualified borrower who could make timely repayment of its loan and interest.

(Doc. 205 at 23-24 (citations omitted; emphasis added)). "Given the record in this case, [trial] counsel cannot be faulted for failing to argue lack of intent to harm based on security interests and lack of actual losses. And even if [trial] counsel had made those arguments, it would not have made any difference in the outcome of any stage of [Movant's] case." (*Id.* at 25; *see id.* at 25 n.5 ("[A]ctual loss is not an element of the crimes for which [Movant] was convicted and sentenced."); *United States v. Artuso*, 482 Fed. Appx. 398, 402-03 (11th Cir. 2012) ("The formulation and implementation of a scheme to defraud support a prosecutable offense [for mail or wire fraud] regardless of [the scheme's] ultimate success or actual impact on the victim."); *United States v. Sokolow*, 91 F.3d 396, 406 (3rd Cir. 1996) ("In general, to satisfy the elements for mail fraud, proof of actual loss by the intended victim is not necessary." (internal quotations omitted)).

With respect to Movant's specific claims of ineffective assistance during the

pretrial stage, the government notes the following:

1.  "none of the charges for which [Movant] was convicted require proof that the victim was a financial institution" (Doc. 205 at 26);

2.  Movant "does not identify what discovery counsel failed to review and how any such review would have made a difference in the outcome of her trial"; and "review of counsel's cross-examination of each of the cooperating co-defendants shows that counsel was prepared and tested their credibility based on their prior statements to the Government" (*id.*);

3.  "Counsel's performance at the suppression hearing, at trial, and at sentencing refutes Defendant's effort to portray him as knowing nothing about the events of the case." (*id.* at 27);

4.  Movant "does not identify any police reports or surveillance video that actually existed that would have supported her testimony at the suppression hearing," which testimony this Court discredited in denying her motion to suppress the contents of the purse she was carrying when arrested (*id.* at 27-28; *see id.* at 2-3);

5.  "There is nothing in the record to suggest that either the Speedy Trial Act or Defendant's constitutional speedy trial rights were violated." Indeed, "the Government calculates that approximately 58 days of non-excludable time under the Act [out of the 70-day allotment] elapsed between Defendant's initial appearance and the beginning of trial." (*Id.* at 29-30 (footnotes omitted)); *see id.* at 30 n.7 ("The 58 days consists of the 5 days between May 17 and 22, 2013, the 8 days between June 11 and June 19, 2013, and the approximately 45 days between December 3, 2013 and January 17, 2014."));

6.  Movant "baldly alleges that counsel failed to subpoena any witnesses, failed to interview anyone, failed to consult with a forensic accountant, failed to subpoena employees of the companies that the defendants operated, and failed to retain a handwriting analys[t]. With respect to witnesses or former employees, Defendant does not identify any specific witness by name and does not allege anything that any purported witnesses could have testified about or that could have made a difference in her case." (*Id.* at 30-31). And

13

Movant "simply alleges that counsel should have retained a handwriting expert who could have 'dispute[d] or confirm[ed]' signatures" and "should have retained [a forensic accountant], providing nothing showing what the accountant would have testified to or what difference it would have made in this case." (*Id.* at 32).

The government summarizes its argument regarding all of Movant's claims as follows:

> [Movant's pleadings] present bald, conclusory allegations that do not include, describe, or reference facts, issues, or even arguments showing that counsel erred. The record, which reflects that counsel vigorously litigated this case in the face of overwhelming evidence, does not support any of [Movant's] claims. Where [Movant] does explain her claim, she relies on an incorrect description of the evidence, the law, the record, or a combination of all three. Given the overwhelming evidence against her, [Movant's pleadings] do not present any basis for the Court to find that any alleged error made a difference in this case. As such, she cannot show error or prejudice with respect to counsel's performance . . . .

(*Id.* at 17-18).

### 3. **Movant's Reply**

In her reply brief, Movant lists three "key (or pivotal) errors and/or omissions," including the following:

1. [Her] Constitutional right to Speedy Trial was violated. [Her] Trial Attorney failed to notice and/or challenge this violation.

2. [Her] Trial Attorney failed to research/comprehend/ explain/challenge the fact that none of [her] alleged conduct satisfies the elements of the charged offenses. These failures inevitably infected every remaining facet of [her] defense, which should have begun with a review of

14

jurisdiction.

(Doc. 212 at 1). Movant alleges that the indictment charged her with racketeering "by statutory codes," i.e., with violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 (RICO), although the "government cleverly deceived the jury (and defendant) by never saying the word 'racketeering' or 'RICO.'" (*Id.* at 3-4; *see id.* at 10 ("When the indictment language fails to convey the statutory language, the indictment can easily be constructively amended. As in this case, the description of the offense was broadened until the jury was misled into the belief that a felony occurred. This violates defendant's Fifth Amendment right not to be held accountable for anything not properly charged by indictment." (footnotes omitted))).

> [T]here are several things [trial counsel] failed to cover when he presented his proposed jury instructions: 1) [t]he definition of scheme and artifice to defraud; 2) the meaning of "property" as it relates to commercial transactions; 3) fiduciary duty and/or confidential relationship; 4) fraud versus deceit; 5) racketeering activity. Had these terms been explained in the jury instructions, the jury would have understood the frame of reference for assessing the facts and alleged conduct of the defendant. Without these definitions, the defendant was prejudiced (by her attorney's ineffectiveness) and the prosecutor was permitted to mislead the jury by allowing them to believe that deception and defrauding were one and the same.

(*Id.* at 15 (footnote omitted)). Movant asserts that counsel also failed to raise a speedy trial claim regarding the gap in time between Movant's arrest in January 2009

15

and her indictment in May 2013, which exceeded the allowable 30-day period for bringing an indictment after an arrest. (*Id.* at 6 n.7). Movant argues that had the original indictment been dismissed on speedy trial grounds, the government may have been reluctant to re-indict because her "alleged conduct most likely was merely misdemeanor conduct, requiring no jail/prison time," which trial counsel would have understood with an adequate pretrial investigation. (*Id.* at 6-7).

### 4.   <u>Analysis</u>

"For the substantive mail fraud charges under 18 U.S.C. § 1341, the government must prove beyond a reasonable doubt: (1) an intentional participation in a scheme to defraud a person of money or property, and (2) the use of the mails in furtherance of the scheme." *United States v. Ramirez*, 724 Fed. Appx. 704, 711 (11th Cir. 2018) (internal quotations omitted). "To sustain a conviction for wire fraud, under 18 U.S.C. § 1343, the government must prove that the defendant: (1) participated in a scheme or artifice to defraud; (2) with the intent to defraud; and (3) used, or caused the use of, interstate wire transmissions for the purpose of executing the scheme or artifice to defraud." *United States v. Machado*, 886 F.3d 1070, 1082-83 (11th Cir. 2018) (internal quotations omitted). "Wire fraud may be proven by circumstantial evidence. Likewise, a jury may infer the 'intent to defraud' from the defendant's conduct and circumstantial evidence. Evidence that the

16

defendant profited from a fraud may also provide circumstantial evidence of the intent to participate in that fraud." *Id.* at 1083 (citations omitted); *see id.* at 1083-84 (concluding that there was sufficient evidence to support Appellant's "culpable knowledge and intent to commit wire fraud," and affirming his convictions, because "the record evidence sufficiently established that [Appellant] knowingly participated in a scheme to obtain over $700,000 in fraudulent loans from various banking institutions by making material misrepresentations. [Appellant's] loan applications each contained false statements about his intended use for the collateral, his assets and liabilities, and his employment status."); *United States v. Mayer*, 679 Fed. Appx. 895, 899 n.1 (11th Cir. 2017) ("To show a scheme to defraud, the government must present evidence of material misrepresentations or the omission or concealment of material facts. An intent to defraud may be found when the defendant believed that he could deceive the person to whom he made the material misrepresentation out of money or property of some value." (citations and internal quotations omitted)). "Because the elements of wire fraud are analogous to those of mail fraud, the statutes generally are interpreted similarly." *United States v. Roopnarine*, 718 Fed. Appx. 797, 802 (11th Cir. 2017).

The evidence of Movant's fraudulent activities, set forth earlier in this Report, puts to rest any doubt that she intended to defraud, and did defraud, the victims in

this case; that she profited thereby; and that she is guilty of wire and mail fraud. Movant's contentions regarding the time scope of the conspiracy; the lack of a qualifying financial institution; the alleged speedy trial violations; and the racketeering charges hidden in an indictment that charges only conspiracy to commit, and the commission of, mail and wire fraud, are without merit. The controlling caselaw and undisputed evidence shows that Movant fraudulently obtained money during the time frame of the conspiracy; that she was not charged with a RICO violation; that her crimes did not require a financial institution as a victim; and that there were no speedy trial violations. *See, e.g., United States v. Burk*, 737 Fed. Appx. 963, 968 n.10 (11th Cir. 2018) (distinguishing the crime of mail fraud affecting a financial institution, for which the limitations period is 10 years, *see* 18 U.S.C. § 3293(2), from the crime of mail fraud not affecting a financial institution, for which the limitations period is 5 years, *see* 18 U.S.C. § 3282). An element of bank fraud, in violation of 18 U.S.C. § 1344, is that the fraud victim be a financial institution, but that is not an element of either mail or wire fraud in violation of 18 U.S.C. §§ 1341, 1343. And Movant was arrested by the government on the charges contained in the indictment on or about May 14, 2013, the day the indictment issued, not four years previously. (*See* Docs. 2, 7, 16).

Movant has not even attempted to refute specifically any of the facts recited

by the government in its sentencing memorandum and in its response to her motion to vacate. Nor has she provided any specific basis to support her seven ground-one claims that trial counsel's performance was deficient or that the outcome of her trial would have been different but for that allegedly deficient performance. Her first ground for relief fails.

### B.  Ground Two: Ineffective Assistance At The Plea Stage

In ground two, Movant claims ineffective assistance of trial counsel during the plea stage of the proceedings "when counsel failed to properly present the terms (or even the existence) of a plea agreement." (Doc. 200 at 15). Nothing in her § 2255 motion (Doc. 193) offers support for this claim, and her brief (Doc. 200) does not present any basis for granting it, either.

The government responds as follows:

[Movant] presents this claim in a header only, without further development. The record refutes a claim that counsel failed to present [Movant] with a proposed plea agreement – in seeking a continuance of the trial date, counsel specifically noted in January 2014 that "[Movant] seeks this continuance to have more time to consider the proposed plea agreement." In claiming that counsel did not "properly present" the terms of the agreement, [Movant] does not fault counsel or explain how anything counsel did or did not do improperly influenced her decision to reject the plea and go to trial. Similarly, . . . nothing in the record indicates [Movant] was ever interested in pleading guilty and [she] nowhere alleges, even now, an interest in pleading guilty.

(Doc. 205 at 33 (formatting altered; citations omitted)).

19

In her reply brief, Movant argues:

Had trial [counsel] told the prosecutor he planned to explain "racketeering" to the jury, armed with the knowledge that none of the conduct the government alleged satisfied the elements of racketeering; the prosecutor would have been MUCH MORE amenable to negotiating for a lesser offense plea (by dismissing the indictment and allowing the defendant to plead to an information). [Movant's] attorney would have been negotiating from a point of strength.

. . . .

If the government knew the defense attorney planned to actually fight, the government may have wanted to minimize risk (and preserve resources), thereby avoiding a trial which they might lose because none of the conduct alleged remotely resembled "racketeering" (a term widely known among ordinary people). Though the jury may have thought wrong had been done, the prosecutor may have been hard-pressed to convince them [Movant] was a "racketeer." Once again, [Movant's] attorney would have been negotiating from a point of strength with the prosecutor. In point of fact, [Movant] is not now, nor has she ever been a "racketeer." If trial attorney was effective, not only should he have mentioned RICO, but he should have ensured the prosecutor knew he was fully versed on what constituted RICO conduct and was prepared to defend against it. Poor research [INVESTIGATION] by [trial counsel] deprived [Movant] of bargaining power during the plea stage. Her trial attorney's ineffectiveness prejudiced her plea stage defense.

(Doc. 212 at 18, 19).

Movant's ground two presumes she was charged with RICO violations, but that assumption is false. (See Doc. 2 (indictment charging Movant and her co-conspirators with conspiracy to commit, and the commission of, mail and wire fraud, without mentioning racketeering or citing the RICO statutes)). Ground two fails.

### C.    Ground Three: Ineffective Assistance At The Sentencing Hearing

In ground three, Movant claims ineffective assistance of trial counsel at the sentencing hearing:

9.    Petitioner's counsel violated [her] Fifth and Sixth Amendment rights to Due Process and to effective counsel when he failed to properly argue sentencing with proper citation to authority; and, failed to understand the applicable advisory guideline range and failed to notice or object to the sentence which was more than double the high end of a properly calculated guideline for petitioner's first ever conviction.

10.    Petitioner's counsel violated [her] Fifth and Sixth Amendment rights to Due Process and to effective counsel when he failed to petition the court for relief due to Mitigating factors.

11.    Petitioner's counsel violated [her] Fifth and Sixth Amendment rights to Due Process and to effective counsel throughout the instant case, admittedly so by his statement at the sentencing hearing, "It was my fault. I did not understand the nature of what my client was trying to explain to me, quite frankly."

12.    Petitioner incorporate[s] herein ¶¶ 9-11, [showing that] but for counsel's unprofessional errors, [Movant] should have been advised to do an Alford Plea, which would have given [her] the Acceptance of Responsibility thereby causing the offense calculation to be reduced by 3 points; along with No criminal history point and little to no loss during the temporal scope of the conspiracy as defined by the indictment there was a high probability that defendant would have been a likely candidate for a non-custodial sentence.

(Doc. 200 at 18). Neither in her § 2255 motion (Doc. 193) nor in her supporting brief (Doc. 200) does Movant offer support for these claims, except for the passage noted earlier, in which she states that counsel's "lack of comprehension or understanding

21

of the alleged losses that were not within the temporal scope of the conspiracy as

defined by the indictment of December 1, 2007 through February 11, 2009, was

further reiterated in the sentencing hearing when he stated, 'It was my fault. I did not

understand the nature of what my client was trying to explain to me, quite frankly.' "

(Doc. 200 at 8).

The government responds as follows:

[T]he record refutes [Movant's] claims that counsel erred in connection with sentencing, failed to present mitigating factors (see, e.g., counsel's sentencing memorandum, arguments at sentencing, and presentation of witnesses at sentencing on [Movant's] behalf) and that counsel was ineffective "throughout the instant case" (the record reflects that counsel aggressively litigated the case despite the overwhelming evidence of guilt). Moreover, certain of her claims are just plain wrong. For example, [Movant] claims that counsel failed to object to a sentence that was twice the high end of a properly calculated Guidelines range. [Movant's] sentence was squarely in the middle of the applicable Guidelines range and [Movant] has not identified any issue calling the Court's Guidelines calculation into question.

[Movant] points to counsel's statement at sentencing that he was responsible for raising the "bid-in" loss argument late because he did not understand what his client was telling him. That statement is addressed, and explained in context, in connection with [Movant's] loss arguments above. Because the "bid-in" argument lacked merit, i.e., would not have reduced [Movant's] Guidelines loss amount even if timely raised, counsel's statement provides no basis for relief on collateral review.

(Doc. 205 at 34-35; see id. at 35 ("Defendant would not have been entitled to a

downward Guidelines adjustment for acceptance of responsibility simply by

22

pleading guilty, whether pursuant to <u>Alford</u> or not." (citing *United States v. Moriarty*, 429 F.3d 1012, 1023 (11th Cir. 2005), for the proposition that "[t]he defendant bears the burden of clearly demonstrating acceptance of responsibility and must present more than just a guilty plea"))).

In her reply brief, Movant argues that trial counsel "failed to understand (or explain) that [she] was charged with 'racketeering activity.' Just because racketeering (or RICO) was never mentioned in the indictment, does not change that fact. 'Racketeering activity' is defined by statute." (Doc. 212 at 21 (footnote omitted)). Movant argues that this failure led counsel and the trial court to miscalculate her guideline sentence, and thus her "64 month sentence far exceeds the statutory maximum, and by law, must be reversed." (*Id.* at 22; *see id.* at 20-22).

> In addition to the previously explained guideline errors, the court (due to counsel's ineffectiveness), entered an illegal judgment containing restitution for (1) acts which are not criminal (2) alleged losses occurring "outside the temporal scope" of the conspiracy (3) losses not tied to the counts of conviction. All these errors (relating to restitution), **constitute reversible error** and require amendment or reversal of the judgment. . . .
>
> Once again this illuminates the fact that [trial counsel's] failure to understand the alleged offenses (and elements thereof) **infected all remaining areas of [Movant's] case and caused her defense to be prejudiced** by a) fighting issues which had no relevance; b) failure to defend other issues which went to the crux of the matter (that [she] did not commit any felonious acts); c) and, most crucial, resulted in [Movant] receiving a criminal conviction and sentence for conduct

23

which at best is a misdemeanor and may only violate "rules," rather than criminal law.

(*Id.* at 23; *see id.* at 24 (arguing that trial counsel should have requested that Movant be given "first offender treatment" under Georgia law — although Georgia sentencing law does not apply in federal court where defendants are being sentenced for federal crimes)).

In its sentencing memorandum, the government addressed Movant's objection to the loss amount as follows:

Defendant has objected to a loss amount in excess of $1 million for the purpose of applying USSG § 2B1.1. Defendant asserts that such amount does not properly reflect the status of the loans and whether in fact there was an actual loss.

The Court should overrule this objection. *The loss amount that the Government recommends for Defendant (as with her co-defendants) consists of actual losses incurred by lenders after foreclosure on fraudulent loans and taking into account any proceeds realized by the lenders from selling the foreclosed properties to a third party.* The recommended loss amount does not include any amounts for loans for which lenders have not incurred an actual loss to date. Thus, the recommended Guidelines loss amount does not include amounts for several loans that the defendants fraudulently obtained because lenders have not yet foreclosed and recorded a loss. Nor does the recommended Guidelines loss amount include any loss for loan closings that were stopped by law enforcement.

A summary chart listing each of the loans included in Defendant's offense and relevant conduct is attached as Exhibit A. In addition to some basic information about each loan, the chart reflects actual loss by defendant for each property attributable to each defendant. As

summarized in the attached chart, Defendant should be held responsible for $1,179,630 in actual losses that lenders have reported to the Government. *These are losses incurred after foreclosure of the fraudulent loans and less the proceeds of a sale to a third party.* The chart reflects no actual loss amount for several loans – loans for which lenders have not foreclosed, or loans stopped by law enforcement.

(Doc. 130 at 7-8 (emphasis added)).

Movant responded in her sentencing memorandum:

It appears that the loss amounts for the mortgage based loans for the Georgia properties may be inaccurate. Specifically, . . . state property records show that after the initial transfer to Quicken Loans, there were other transfers wherein the transferor (Quicken) received payment above the mortgage amount, and that the Department of Housing and Urban Development sold the property at a lower rate. Since the amount recovered was greater than the loan amount, there should be a credit to the loss amount pursuant to [§] 3E1(ii).

(Doc. 136 at 1-2).

At sentencing, trial counsel argued that the loss amount attributed to Movant should be reduced because for each of two properties on which the buyer had defaulted on the mortgage for that property, the mortgagor had received an amount at the foreclosure sale that exceeded the amount owed on the mortgage. (Doc. 168 at 3-6). The government responded that it was not prepared to offer proof of the loss amount because until the eve of the sentencing hearing, trial counsel did not object to the $1.1 million loss amount as previously calculated and revealed to counsel. (*Id.* at 9-16). The Court then opined:

25

> I do rule that [Movant's] objection is untimely on loss amount. I would observe that I believe that I believe [a] hearing on this matter, the government would prevail, for this reason: it is very typical for lenders to bid in loans at or near the loan amount . . . when it goes to a foreclosure sale. That's a very typical scenario. And the bank's motivation may be to not . . . book a loss at the time of the foreclosure. I don't know how many bankers would want to admit that, but [] I believe that is a very common practice. Then there will be a resale. And I believe the resale would reflect the true value of the property if it comes very close in time to the foreclosure sale. And the bank, once it owns the property, generally doesn't have any incentive to hold on to it. They want to get rid of it and, if possible, get some cash into the bank. So I . . . understand Mr. Spencer's argument about the bid in. But I don't think, ultimately, it would prevail, given the very low amount that the bank got on resale of the property.

(Id. at 17-18 (formatting altered)).

Because of the complexity of the loss-amount issues, the Court ordered the government to file "a supplemental response to the § 2255 motion, which must include: (1) a narrative explanation of how each line of its loss chart (Doc. 130-1 at 2) was calculated, with citations to supporting documents showing the changes in ownership and costs involved for each property for which a loss is listed; and (2) the legal sources justifying the method the government used to calculate the losses." (Doc. 232). The government has done so. (Doc. 238).

The Tenth Circuit has recently outlined in detail how loss is to be calculated in cases such as Movant's, guided by U.S.S.G. § 2B1.1(b)(1):

[A] district court shall enhance a defendant's base offense level "[i]f

26

the loss exceeded $5,000." . . . Application Note 3 to § 2B1.1 fleshes out how the district court is to calculate "loss." *See generally Stinson v. United States*, 508 U.S. 36, 38 (1993) (holding "that commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline"). To begin with, Application Note 3 provides that, as a general rule, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). In turn, Application Note 3 [explains that actual loss] "means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3(A)(i). "Pecuniary harm means harm that is monetary or that otherwise is readily measurable in money." *Id.* cmt. n.3(A)(iii). And "reasonably foreseeable pecuniary harm means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* cmt. n.3(A)(iv). Notably, Application Note 3 treats amounts recovered by a fraud victim, such as the proceeds from a foreclosure sale, as "Credits Against Loss," rather than part of the initial "actual loss" calculation. More specifically, Application Note 3 provides that "[l]oss shall be reduced . . . [i]n a case involving collateral pledged or otherwise provided by the defendant, [by] the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." *Id.* cmt. n.3(E)(ii). Thus . . . loss equals actual loss (or intended loss) minus credits against loss.

Importantly, for purposes of this appeal, the plain language of Application Note 3 makes clear that the concept of reasonable foreseeability applies only to a district court's calculation of "actual loss," and not to its calculation of the "credits against loss." Consequently, it is irrelevant in this case whether or not [Appellant], at the time she negotiated the various mortgages at issue, reasonably anticipated a precipitous decline in the real estate market that might result in *the original lender **or successor lenders** being unable to recoup their losses from **the sale of pledged collateral*** should she default. Instead, the only foreseeability issue in this case, and the one

27

> that the district court correctly focused on, is the amount of the potential pecuniary harm that might result from [Appellant's] offenses, i.e., the reasonable foreseeability of the "actual loss" (rather than the "loss") that occurred in this case.

*United States v. Crowe*, 735 F.3d 1229, 1236-37 (10th Cir. 2013) (footnote and internal quotations omitted; emphasis added). In *United States v. Morris*, 744 F.3d 1373 (9th Cir. 2014), the Ninth Circuit cited *Crowe* and stated:

> We adopt the two-step approach first articulated by the Eastern District of Virginia, and subsequently adopted by the Second, Sixth, and Tenth Circuits. In calculating loss in mortgage fraud cases, these Circuits hold that the first step is to calculate the greater of actual or intended loss, where actual loss is the reasonably foreseeable pecuniary harm from the fraud. This amount will almost always be the entire value of the principal of the loan, as it is reasonably foreseeable to an unqualified borrower that the entire amount of a fraudulently obtained loan may be lost. The second step is to apply the 'credits against loss' provision and deduct from the initial measure of loss *any amount recovered or recoverable by the creditor from the sale of the collateral*. This second calculation is made without any consideration of reasonable foreseeability.

*Id.* at 1375 (emphasis added).

Although the Eleventh Circuit apparently has not outlined in similar detail the procedure for calculating loss in cases such as Movant's, it did note in a recent case — without comment, because the methodology used to calculate loss was not at issue — that for a home that had been sold, "the PSR calculated loss by subtracting the sale price from the loan amount." *United States v. Cavallo*, 790 F.3d 1202, 1233

28

(11th Cir. 2015).

In its supplemental response, the government outlines in detail the loss amounts on six properties used to calculate Movant's sentencing level. (*See* Doc. 238 at 2-6; Doc. 238-1; Doc. 130-1 at 2). The government notes, correctly, that Movant may not attack the Court's sentencing calculation directly in this § 2255 proceeding, but rather must do so indirectly, via claims of ineffective assistance of counsel. But the only *specific* claim identified in the record in this regard is the claim that counsel did not adequately argue that, for two properties used in the loss calculation, the loss amount should reflect the "bid-in" price payed by the creditor at foreclosure to buy the collateral property — from itself, as it were — rather than the price the creditor ultimately obtained for the property when it was sold to a third party. But the government has amply demonstrated that this claim is unavailing:

> [Movant] was not due any offset against loss for these foreclosure bids, much less to treat the losses on these two loans as zero. [Movant's] exhibits show that the same party that held the loan made a bid at foreclosure in order to take possession of the property securing that party's loan. No actual money changed hands (the documents show that the lender is [] the party [both] of the first [part] and second part on the foreclosure paperwork). [(*See* Docs. 238-2, 238-3).] Defendant was only due a reduction under § 2B1.1 for amounts "recovered" from a "disposition" of the collateral. § 2B1.1 cmt. n. 3(E)(ii). "While a lender may receive something of value from purchasing collateral in a foreclosure sale using a credit bid, the lender does not 'recover' any amount of money until the property is ultimately sold to a third party." United States v. Kerley, 784 F.3d 327, 348 (6th Cir. 2015) (affirming

29

district court's "loss calculation on the difference between the amount loaned and the amount eventually recovered by selling the properties securing the loan."); see also United States v. Green, 648 F.3d 569, 583–84 (7th Cir. 2011) (rejecting defendant's argument to credit against loss [the] proceeds from foreclosure sales "at which the lenders were the highest bidders").

(Doc. 238 at 10 (citation altered)); *see Kerley*, 784 F.3d at 348 ("Assuming, *arguendo*, that a lender's acquisition of foreclosed property through a credit bid could constitute a disposition, we must read 'disposition' in light of the Sentencing Commission's direction. Application Note 3(E)(ii) of Guideline 2B1.1 directs the court to credit '*the amount the victim has recovered* at the time of sentencing from the disposition of the collateral.' U.S.S.G. § 2B1.1 cmt. 3(E)(ii) (2012) (emphasis added). . . . *[T]he lender does not 'recover' any amount of money until the property is ultimately sold to a third party*." (emphasis added)); *Green*, 648 F.3d at 584 ("Where a lender forecloses and acquires the property at public auction by making a credit bid (i.e., a bid that offers to cancel the outstanding principal, interest, and related fees in return for title to the property), the credit bid is not a reliable measure of the actual market value of the property.").

Movant has offered nothing of substance in response to the government's explanation of how the loss attributed to her was calculated and why that calculation is correct. Instead, she has filed two motions seeking (1) the submission of the

30

government's evidence in a different format (Doc. 244 (expressing Movant's appreciation for "the government's thorough presentation," but asking the Court to order the government "to place all the information into a spreadsheet (or similar representation) detailing the amount of LOSS")); and (2) a hearing on the amount of loss, based on her erroneous belief that the final loss amount must be calculated on the basis of the loss consummated "during the temporal scope of the alleged conspiracy," rather than based on the ultimate disposition of the properties for which mortgages were fraudulently obtained by Movant and her co-conspirators (Doc. 249). These motions should be denied.[1]

### D.    <u>Ground Four: Ineffective Assistance On Appeal</u>

In ground four, Movant claims ineffective assistance of counsel on appeal:

13.    [H]er attorney conceded guilt without [Movant's] knowledge or consent.

14.    [C]ounsel failed to articulate the correct standard of review (see abuse

---

[1]Movant also has filed two motions (Docs. 237, 239) seeking reconsideration of the Court's restitution order, but those motions are properly addressed directly to the District Judge because a federal prisoner may not challenge a restitution order via a § 2255 motion. *See Mamone v. United States*, 559 F.3d 1209, 1211 (11th Cir. 2009) ("Based on this Court's prior precedent, the statutory language, and sister circuit authority, the district court did not err in refusing to address [Appellant's] restitution challenge in the context of his § 2255 motion. Despite the presence of claims challenging his custody and requesting release from custody, the restitution claim did not seek release from custody and was rightly denied by the district court.").

of discretion, should have been de novo).

15.   [H]er attorney failed to consult [Movant] before writing appellate brief regarding the appeal, as well as failed to file a Motion for Extension of Time to file appellate brief as [Movant] requested . . . .

16.   [H]er attorney failed to obtain mitigating evidence (e.g. police report, surveillance camera footage to corroborate [Movant's] truthful testimony regarding the Suppression hearing events).

17.   The petitioner incorporate[s] ¶¶ 13-16, [showing that] but for counsel's unprofessional errors, the result of the proceedings would have been different, and the petitioner would have received the benefit of the direct appeal.

(Doc. 200 at 19). Neither in her § 2255 motion (Doc. 193) nor in her supporting brief

(Doc. 200) does Movant offer support for these claims.

The government responds that all of Movant's claims of ineffective assistance

of appellate counsel fail on both prongs of the *Strickland* test, and that "[g]iven the

overwhelming evidence against [Movant], there is no reasonable probability that the

Eleventh Circuit would have held that the evidence adduced at trial was insufficient

to sustain [her] convictions." (Doc. 205 at 36-37; *see id.* at 37-38 (addressing

Movant's assertion that almost every paragraph in her PSR contains "false and/or

misleading statements" (*see* Doc. 202 at 1) by noting that she "does not identify a

single, specific correction to anything in the PSR, much less one that could have

made a difference to her sentence")).

32

In her reply brief, Movant lists as one of the three key or pivotal errors in this case that her "two appeal attorneys should have made it their first priority to look for reversible error; e.g., the insufficiency of the evidence (as it related to the elements of the offenses)." (Doc. 212 at 1). She elaborates that her appellate counsel failed to notice that her sentence exceeded the statutory maximum and that "the indictment failed to allege, and the government failed to present, any evidence of **two predicate offenses** necessary to satisfy the required elements of 'racketeering activity.' " (*Id.* at 25).

For the reasons stated elsewhere in this Report, Movant's claims of ineffective assistance of appellate counsel fail because she had no reasonable likelihood of success on appeal, regardless of the claims raised by appellate counsel. (*See* Doc. 186 at 10 (Eleventh Circuit order denying Movant's direct appeal and stating: Movant's "total sentence fell within the guideline range of 57 to 71 months' imprisonment, and . . . . based on the totality of the circumstances, we cannot say that the district court committed a clear error of judgment by imposing an unreasonable sentence.")). The Court notes once again that Movant was neither charged with, nor convicted of, a RICO violation.

### E.    Evidentiary Hearing

Movant asks for an evidentiary hearing. (Doc. 200 at 20). But she is not

entitled to one.

> A prisoner is entitled to an evidentiary hearing on a motion to vacate
> "unless the motion and files and records of the case conclusively show
> that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see
> Anderson v. United States*, 948 F.2d 704, 706 (11th Cir. 1991). Thus, if
> a movant "alleges facts that, if true, would entitle [her] to relief, then
> the district court should order an evidentiary hearing and rule on the
> merits of his claim." *Aron v. United States*, 291 F.3d 708, 715 (11th
> Cir. 2002) (quotation marks omitted). [But] the district court is not
> required to hold a hearing [] "if the allegations are patently frivolous,
> based upon unsupported generalizations, or affirmatively contradicted
> by the record." *Winthrop-Redin v. United States*, 767 F.3d 1210, 1216
> (11th Cir. 2014) (quotation marks omitted).

*Chun Hei Lam v. United States*, 716 Fed. Appx. 850, 851 (11th Cir. 2017).

The government argues that a hearing is not required here because "[a] federal habeas corpus petitioner is entitled to an evidentiary hearing [only if she] alleges facts which, if proven, would entitle [her] to relief. As shown above, [Movant] has failed to meet this burden." (Doc. 205 at 41 (citation and internal quotations omitted)). The Court agrees. Movant's "allegations are patently frivolous, based upon unsupported generalizations, or affirmatively contradicted by the record." *See Chun Hei Lam*, 716 Fed. Appx. at 851. The Court finds no basis for holding an evidentiary hearing in this matter.

## V.   <u>Certificate of Appealability</u>

A § 2255 movant must obtain a certificate of appealability ("COA") before

appealing the denial of a motion to vacate. 28 U.S.C. § 2255(d); 28 U.S.C. § 2253(c)(1)(B). A COA may issue only when the movant makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard is met when "reasonable jurists could debate whether (or, for that matter, agree that) the [motion to vacate] should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotations omitted). A movant need not "show he will ultimately succeed on appeal" because "[t]he question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 934 (11th Cir.) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 337, 342 (2003)). Although Slack involved an appeal from the denial of a 28 U.S.C. § 2254 petition, the same standard applies here. *See Jones v. United States*, 224 F.3d 1251, 1254 (11th Cir. 2000) (applying Slack standard in § 2255 case). Because there is no reasonable argument that any of Movant's grounds has merit, a COA should not issue in this matter.

## VI.    <u>Conclusion</u>

**IT IS RECOMMENDED** that Movant's 28 U.S.C. § 2255 motion (Doc. 193) and motion for an evidentiary hearing (Doc. 215) be **DENIED**; that Movant's motion to reverse stay (Doc. 230) be **GRANTED** *nunc pro tunc*; that Movant's

motion for an order directing the government to resubmit the loss-calculation evidence (Doc. 244) and her motion for an evidentiary hearing regarding the loss calculation (Doc. 249) be **DENIED**; and that Movant be **DENIED** a certificate of appealability.

The Clerk is **DIRECTED** to withdraw the reference to the Magistrate Judge.

**SO RECOMMENDED** this 15th day of January, 2019.

/s/ J. Clay Fuller
J. Clay Fuller
United States Magistrate Judge

36